UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL ACTION NO. 6:26-CR-28-DLB

UNITED STATES OF AMERICA                                                                 PLAINTIFF

V.                    **MEMORANDUM ADDRESSING
                      UNRESOLVED GUIDELINE OBJECTIONS**

JUSTIN BRYANT                                                                             DEFENDANT

\* \* \* \* \*

Pursuant to the directives of the Court's Sentencing Order, the United States submits to the Court this Memorandum addressing the Defendant's unresolved objections to the Presentence Investigation Report ("PSR") that affect the guideline calculations. As discussed in more detail below, it is the position of the United States that the PSR has correctly calculated Bryant's guideline range. As a result, Bryant's objections should be overruled.

Both the plea agreement [R. 41 at 2-3] and the PSR describe Justin Bryant's offense conduct in this case as being comprised of two encounters with law enforcement. [PSR Paragraphs 7-8]. First, on December 11, 2023, law enforcement conducted a traffic stop on a vehicle in which Bryant was a passenger. [PSR Paragraph 7]. The officers observed Bryant stuffing items down his pants. [PSR Paragraph 7]. Though Bryant "pinned himself to against the car to try and prevent officers from searching his person," officers ultimately found Bryant to be in possession of 22.57 grams of methamphetamine,

3.57 grams of a substance containing fentanyl, and a loaded firearm. [PSR Paragraph 7; R. 41 at 2-3]. In their report, officers documented that Bryant told them that he had the firearm because, "he is in a dangerous game and they are dangerous people out there." In the plea agreement, Bryant admitted that he, "possessed this firearm to protect himself from the dangers associated with drug trafficking." [R. 41 at 3]. State officials arrested Bryant in connection with this conduct.

However, Bryant did not remain in custody and was undeterred from a return to drug trafficking upon his release. On March 1, 2025, KSP conducted a traffic safety check point in Floyd County. When Bryant attempted to avoid the checkpoint, KSP Trooper Billy Ball pursued him to the Pizza Den restaurant. Upon approach, Trooper Ball saw a large quantity of methamphetamine in Byrant's lap. When Trooper Ball attempted to reach into the vehicle to seize the methamphetamine, "Bryant attempted to destroy the evidence by ripping the bags open." [PSR Paragraph 8]. When Trooper Ball instructed Bryant to stop, "Bryant began to throw the drugs inside of the truck and threw a handful of methamphetamine in Trooper Ball's face." [PSR Paragraph 8]. Bryant continued to be noncompliant until Trooper Ball deployed his taser, removed him from the vehicle, and placed him on the ground. [PSR Paragraph 8]. More than 80 grams of methamphetamine was seized during this encounter. [PSR Paragraph 8].

On March 27, 2025, the Grand Jury returned a four-count indictment against Bryant. Count One (possession with the intent to distribute methamphetamine and fentanyl), Count Two (possession of a firearm in furtherance of Count One), and Count Three (possession of a firearm as convicted felon) related to the December 11, 2023

2

conduct. [R. 1]. Count Four (possession with the intent to distribute 50 grams or more of methamphetamine) related to the March 1, 2025 conduct. [R. 1]. Bryant sought to suppress the March 1, 2025 conduct. [R. 20]. Judge Adkins held a suppression hearing during which Trooper Ball testified [R. 30]. Judge Adkins recommended denying suppression [R. 26] and this Court adopted that recommendation [R. 35].

Thereafter, the parties entered into a binding plea agreement to Counts One and Two. [R. 41]. That agreement contained the following provision: "The United States and the Defendant agree to the following specific sentencing range, which binds the Court upon acceptance of this plea agreement. (a) The Defendant's term of imprisonment shall be at least 180 months but not more than 225 months." [R. 41 at 3]. This was not an agreement that the correctly calculated guideline range is 180 to 225 months (there is no such guideline rang in the sentencing table); but is an agreement between the parties that the ultimate sentence in the case – considering the guidelines and all relevant factors under 18 U.S.C. § 3553(a) – should be a number within that range. From the perspective of the United States, the starting point of the analysis of whether to enter such an agreement was that Bryant's criminal history category qualified him as a career offender, which, with the 18 U.S.C. § 924(c) conviction and the acceptance of responsibility credit, corresponds to a guideline range of 262 to 327 months. [PSR Paragraph 75]. However, the United States believes that the nature of Bryant's career offender predicates provided sufficient mitigation in Bryant's case to support a downward variance. Still, the circumstances of the case, including, among other things, the multiple offenses and the resistance to law enforcement in each of those offenses,

limited the intensity of that variance in the view of the United States. These competing factors contributed to the decision to enter into an agreement to the binding range of 180 months to 225 months. The parties are free to argue for a sentence within that range, with the Court making the ultimate decision to either sentence Bryant within that range or to sentence Bryant otherwise and give the parties an opportunity to withdraw from the agreement and proceed to trial. Fed. R. Crim. Pro. 11(c)(1)(C) ("If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:…agree that a specific sentence *or sentencing range* is the appropriate disposition of the case…(such a recommendation or request binds the court once the court accepts the plea agreement)").

Despite the agreement, Bryant has objected to the PSR in substantive ways. In the view of the United States, this does not breach the binding plea agreement, which allows Byrant to make these arguments so long as his sentencing recommendation does not fall below 180 months. However, as the objections strike at some of the legal foundations underpinning the reasons for which the United States entered into the agreement with Bryant and because the objection impact the grounds for the recommendation that the United States intends to make within the binding range, the United States now responds in opposition to Bryant's objections.

1. *Bryant is a career offender.*

Most substantively, Bryant argues that he is not a career offender because he was sentenced on the same day for the offense in Paragraphs 38 and 42, which were not punished with a sentence of more than one year. As discussed in more detail below,

4

Bryant's objections fail because the two referenced offenses were punishable by a sentence of more than one year and are counted separately under the principles of the guidelines.

Whether a defendant is classified as a career offender, is addressed in U.S.S.G. § 4B1.1, which states as follows:

> (a) A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1. "The term 'controlled substance offense' means an offense under federal or state law, *punishable* by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2 (emphasis added). Whether or not two prior convictions are counted separately is determined by reference to U.S.S.G. § 4A1.2(a)(2), which states in pertinent part as follows:

> ***Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest*** (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day.

U.S.S.G. § 4A1.2(a)(2) (emphasis added).

The PSR ascribes career offender predicate status to the offenses in Paragraph 38 (Trafficking in Controlled Substance – 2nd Degree in Floyd County Kentucky Circuit Court Case Number 13-CR-98) and Paragraph 42 (Trafficking in a Controlled Substance Under 2 Grams in Floyd County Kentucky Circuit Court Number 17-CR-288). Bryant raises two reasons that these offenses should not be treated as career offender predicates: (1) he did not receive a sentence of more than one year; and (2) he was sentenced for these offenses on the same day so they should be treated as a single sentence. However, the actual sentence that Bryant received is not the relevant consideration. What matters is whether the offenses are felonies that are *punishable* by a term exceeding a year. First and second-degree drug trafficking under Kentucky law are both at least a Class D felony offenses. *See* KRS 218A.1413 & KRS 218A.1413. Class D felonies are punishable for between one and five years. KRS 532.020. Thus, Paragraphs 38 and 42 qualify as controlled substance offenses by virtue the associated statutory punishments.

The offenses in Paragraphs 38 and 42 are also treated as separate offenses under the guidelines. As reflected in the PSR, Bryant was arrested on Paragraph 38 offense on July 16, 2013. [PSR Paragraph 13]. The Paragraph 42 offense did not occur until May 31, 2017. [PSR Paragraph 42]. These facts, undisputed by Bryant, make clear that there was an intervening arrest between the offenses in Paragraphs 38 and 42, which always results in the offenses being counted separately. *See* U.S.S.G. § 4A1.2(a)(2) ("Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense

6

prior to committing the second offense)."). As a result, Bryant has two prior controlled substance offenses and is properly designated as a career offender.

## 2. Trooper Ball's testimony about Bryant's conduct on March 1, 2025, is not contradicted by the body camera recording.

Though the career offender-related enhancement is the only enhancement that effects the guideline calculation, the United States also opposes the contention of Bryant the body camera video "directly contradicts the assertion that Mr. Bryant was fighting the Trooper or that he was throwing any drugs in the face of the Trooper." [Objection Letter]. The positioning of the body camera relative to the events that are happening in the vehicle limits the visibility of events on the recording. It is not the case, for example, that you can see Trooper Ball's face and Bryant's hands the whole time and the video shows that Bryant never throws any methamphetamine in Trooper Ball's face. On the contrary, during the relevant portion, you can see the side of Bryant's vehicle, but neither his hands nor Trooper Ball's face. However, the video makes abundantly clear that that Bryant is not compliant with Trooper Ball's directives. Thus, it is not correct to say that the video contradicts Trooper Ball. The United States produced the video in discovery and submitted the video to the United States Probation Office, which has reviewed it.[1] In the addendum, the USPO accurately describes what is shown on the recording:

---

[1] Technological issues prevented the playing of the body camera recording during the suppression hearing. However, when the United States offered to admit them as exhibits to the suppression hearing so that the Court could independently review them, counsel for Bryant objected. [R. 30 at 34-35]. As a result, those recordings are not currently in the record. However, the United States intends to bring a copy of the recordings to the sentencing hearing in the event that the Court wishes to see the relevant portions. If Court would prefer to review the recording prior to the hearing, the United States believes that the USPO has a copy or the United States could conventionally file a copy at the Court's direction. At any rate, as discussed herein, the United States believes the Court can rely on the sworn testimony of Trooper Ball, which is, as of yet, uncontradicted by Byrant.

> The probation office believes the information contained in paragraph 8 is accurate. The bodycam footage captured by Trooper Ball supports that Bryant was resisting arrest, as well as Trooper Ball's claim the defendant attempted to destroy evidence and threw methamphetamine in his face. The probation office acknowledges you cannot physically see Bryant use his arm to throw the methamphetamine, as the body camera was too low and only captured the defendant's mid-section and below. However, the bodycam footage captures the methamphetamine crystals that were thrown out of the truck towards Trooper Ball's upper section. Trooper Ball's testimony during an evidentiary hearing in front of U.S. Magistrate Judge Edward B. Atkins on July 29, 2025, also supports this information.

[PSR Addendum].

The testimony of Trooper Ball referenced by the United States Probation Office has been transcribed and is in the record at Docket Entry 30. Concerning his encounter with Bryant at the Pizza Den restaurant, Trooper Ball testified as follows:

```
 6   Q.  Now, when you found the vehicle, what did you do?
 7   A.  I initiated a traffic stop for improper turning.  I
 8   exited my patrol car, walked up to the window.  Me and the
 9   defendant made eye contact.  At first I didn't think he was
10   going to roll the window down, so I went to open his door.  A
11   lot of times people's windows won't roll down, so it's not
12   uncommon to open their door to talk to them.
13       But Mr. Bryant rolled his window down.  I introduced
14   myself as Trooper Ball with Kentucky State Police.  Instantly
15   while doing that, I observed what I believed to be crystal
16   methamphetamine in the lap of the defendant, a large amount of
17   crystal methamphetamine.
18       At that time, I told the defendant to stop.  I opened the
19   driver door.  I told him to get out, which he refused.  I
20   tried to control the evidence.  He immediately started --
21   attempted to destroy the evidence by ripping the bags open,
22   throwing it across the truck, at one point throwing a handful
23   in my face.
24       So I disengaged after a brief struggle, deployed my
25   state-issued CEW, which stands for conductive electrical
```

8

```
 1   weapon, or often known as a taser.  I deployed one cartridge
 2   from my taser.  That was ineffective due to one of the probes
 3   missing Mr. Bryant.  I went in and tried to complete the
 4   circuit, which is what we call a dry stun where you physically
 5   touch the taser to them, which was unsuccessful.
 6       I disengaged a second time and deployed the second and
 7   final cartridge from my taser, which was successful in
 8   achieving NI, which is neuromuscular incapacitation.
 9   Basically all that stands for is it contracts every muscle in
10   your body and you have no control over that.  At that time
11   near the end of that cycle, which is five seconds, I was able
12   to remove Mr. Bryant from the vehicle and placed him on the
13   ground.
14       Once on the ground, I gave numerous commands for
15   Mr. Bryant to roll over and place his hands behind his back.
16   During this time never was Mr. Bryant compliant.  I eventually
17   forced him over on his stomach and forced him into handcuffs.
```

[R. 30 at 26-27]. Trooper Ball's testimony is consistent with both his report and the body camera. These objections are not the first time Bryant has tried to characterize Trooper Ball's testimony as contradictory. This Court rejected a similar argument raised by Bryant in an objection to Judge Adkins's recommendation to deny Bryant's suppression motion. [R. 35 at 7]. The Court noted that, "Judge Atkins found the officers' testimony to be credible," and, "Defendant has not provided any legitimate reason for the Court to doubt the officers' credibility." [R. 35 at 7]. In likeness, the sworn testimony of Trooper Ball is reliable evidence on which the Court can rely, and Bryant has not shown through the video or otherwise, a legitimate reason the Court to reject it. And though this does not impact the guideline range, it does shed some light on how some of the 18 U.S.C. § 3553(a) factors apply to Bryant, including the need to promote respect for the law, the

9

need to promote respect for the law, the seriousness of the offense, and Byrant's history and characteristics.

## CONCLUSION

For the reasons set forth herein, Bryant's objections to the career offender designation and to the PSR's characterization of his response to law enforcement intervention on March 1, 2025 should be overruled. It appears that the remaining objections raised by Bryant have been resolved through the addendum and do not affect the guideline calculation.

        Respectfully submitted,

        PAUL C. McCAFFREY
        FIRST ASSISTANT U.S. ATTORNEY

By:   s/ *Andrew H. Trimble*      .
        Assistant United States Attorney
        601 Meyers Baker Rd., Suite 200
        London, KY 40741
        (606) 330-4838
        Andrew.Trimble@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2026, the foregoing was electronically filed through the CM/ECF system, which will send notice of the filing to all counsel of record.

        s/ *Andrew H. Trimble*
        Assistant United States Attorney